c

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| STEVE CROOKS, *ET AL.*, Plaintiffs | CIVIL ACTION NO. 1:21-CV-04457 |
| VERSUS | JUDGE DRELL |
| PLACID OIL COMPANY, *ET AL.*, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court are the following motions: (1) Rule 12(e) Motions for More Definite Statement and Rule 12(b)(6) Motions to Dismiss (ECF Nos. 35, 56, 80) filed by Defendants White River Operating, L.L.C. ("White River") and Day Town Operating, L.L.C. ("Day Town"); and (2) Rule 12(b)(6) Motions to Dismiss (ECF Nos. 36, 53, 82) filed by Defendant Sanchez Oil & Gas Corporation ("SOG").[1]  Plaintiffs Steve H. Crooks and Era Lea Crooks ("Plaintiffs") oppose the motions.  ECF Nos. 42, 43, 51, 58, 59, 85, 86.

Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 35, 36, 53, 56, 80, 82) should be DENIED IN PART and GRANTED IN PART, as follows:

Because Plaintiffs fail to state a claim for revendicatory relief, Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 35, 36, 53, 56, 80, 82) should be GRANTED IN PART to the extent they seek dismissal of Plaintiffs' revendicatory

---

[1] Defendants adopted the motions previously filed, amending to assert their same arguments as to the Second Amended Complaint (ECF No. 77).  ECF Nos. 80, 82.  The Second Amended Complaint (ECF No. 77) corrected jurisdictional allegations, and thus the parties offered no additional briefing.

claims. Plaintiffs' claims for revendicatory relief against Defendants should be DISMISSED WITH PREJUDICE.

Because Plaintiffs' claims under La. Civ. Code arts. 2305 and 2299 are not prescribed, SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 36, 53, 82) should be DENIED IN PART to the extent they seek dismissal of those claims as prescribed.

And because Plaintiffs state sufficient claims for relief under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed, SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 36, 53, 82) should be DENIED IN PART to the extent they seek dismissal of those claims.

Because Plaintiffs' Amended Complaint (ECF No. 50) complies with the requirements of Rule 8, White River's and Day Town's Rule 12(e) Motions for More Definite Statement (ECF Nos. 35, 56, 80) should be DENIED.

I. <u>Background</u>

Plaintiffs filed a Complaint (ECF No. 1) for state law claims for revendicatory relief and/or recovery of a thing not due or its value based upon diversity jurisdiction. Of the originally named Defendants, only White River, Day Town, and SOG (collectively, "Defendants") remain.[2]

Plaintiffs allege that "over the years," Defendants have produced oil from property owned by Plaintiffs under invalid leases with the State of Louisiana, Department of Natural Resources (the "State"), on and around the Catahoula Basin

---

[2] Placid Oil Company ("Placid"), Louisiana-Hunt Corporation ("LHC"), Hunt Petroleum Corporation ("Hunt"), HPC Operating Company ("HPC"), Axis Onshore, LP ("Axis"), Axis Onshore, L.L.C. ("Axis Onshore"), and XH L.L.C. ("XH") have been dismissed. ECF Nos.31, 32, 33, 34.

adjacent to Little River in LaSalle Parish, Louisiana. ECF Nos. 1 at 3, 50 at 3. Plaintiffs state Defendants drilled from various wells on their property at different times and during different periods of production, including Well Serial Number 163489. *Id.*

Plaintiffs state that *Crooks v. Department of Natural Resources* – a class action for all riparian landowners in and around what was once known as "Catahoula Lake" – recognized in a 2016 judgment (the "*Crooks* judgment") that Plaintiffs were the owners of a portion of the bottom of the Catahoula Basin from the 36 mean sea level ("MSL") mark (high water mark) of Little River to the 24.08 MSL mark (low water mark) of Little River. ECF Nos. 1 at 4, 50 at 3. Plaintiffs claim this encompasses 22,000 acres to which the State previously claimed ownership as a natural lake bottom. *Id.*

Plaintiffs assert that many years ago, the State had leased the same land to several oil and gas developers, including Defendants. ECF No. 1 at 4, 50 at 4. The oil and gas producers drilled several wells on the property, which produced, and still produce, oil in paying quantities for many years. *Id.*

Plaintiffs allege the *Crooks* judgment recognized the State owed to the riparian owners a proportionate share of all oil royalties paid to the State from production by the oil and gas producers from 2003 to 2016, with interest. *Id.* Plaintiffs assert no relief was requested (or awarded) on behalf of the class, or any plaintiff, for the totality of the oil taken from the property under the leases granted by the State

without authority.  *Id.*  Plaintiffs allege the effect of the *Crooks* judgment was to nullify the leases entered by the State with Defendants.  ECF No. 50 at 5.

Plaintiffs claim that at least on of the wells, Well Serial Number 163489, is on their property.  ECF No. 1 at 5.  Plaintiffs assert claims, individually, against all Defendants for all production obtained by each from any wells on Plaintiffs' property as recovery under La. Civ. Code arts. 488 and 526.  *Id.* at 5.  Alternatively, Plaintiffs assert a claim for recovery of the value when the oil was alienated under La. Civ. Code Arts. 2299 and 2305.  *Id.* at 6.

Defendants seek Rule 12(b)(6) dismissals of all claims.  ECF Nos. 35, 36, 53, 56, 80, 82.  White River and Day Town also seek a more definite statement under Rule 12(e).  ECF Nos. ECF Nos. 35, 56, 80.

White River and Day Town seek a more definite statement under Rule 12(e) and a Rule 12(b)(6) dismissal.  ECF Nos. ECF Nos. 35, 56, 80.  White River and Day Town argue Plaintiffs make allegations collectively against all Defendants.  ECF No. 35-1 at 2-3.  They also assert Plaintiffs fail to identify the property they own, the mineral leases at issue, the parties to those leases, when those leases were granted, when the wells were drilled pursuant to those leases, or when each defendant operated a well or produced oil allegedly owned by Plaintiffs.  *Id.* at 2-3.  White River and Day Town seek to have Plaintiffs provide specific allegations as to each Defendant individually, including specifics concerning the property and leases at issue.  *Id.*

White River and Day Town further assert Plaintiffs' revendicatory action fails to state a claim for oil previously sold to date, including as to White River as it no longer operates on the property. *Id.* at 4. On subsequent motion, White River seems to abandon its request to dismiss the revendicatory action against Day Town. ECF No. 56-1 at 3-4. Also, neither White River nor Day Town seek dismissal of Plaintiffs' other claims.

SOG seeks a Rule 12(b)(6) dismissal, arguing that Plaintiffs' claims for revendicatory action fail because they do not seek the return of specific property. ECF No. 36 at 1. SOG asserts Plaintiffs' unjust enrichment claims against SOG are precluded as they have viable alternative claims against the State. *Id.* SOG further argues Plaintiffs' claims are barred by prescription. *Id.*

Plaintiffs responded with an Amended and Restated Complaint ("Amended Complaint"), along with numerous attachments including the evidence attached to the judgment depicting the lands owned by the riparian landowners. ECF No. 50. They allege that their ownership of the land and minerals is beyond dispute[3] and that Defendants have removed minerals from their property over the last ten years. ECF No. 50 at 1. Plaintiffs seek return of any minerals removed that are still in Defendants' possession, and seek payment of the value of the minerals taken and alienated by Defendants. *Id.* at 2. Plaintiffs claim Defendants produced the well on their property under leases with the State who did not own the property or have

---

[3] Plaintiffs allege a Louisiana District Court, the Louisiana Third Circuit Court of Appeal, and the Louisiana Supreme Court all held that Plaintiffs, along with other riparian landowners, are the owners of both the land and mineral rights at issue. ECF Nos. 50 at 1, 50-1, 50-2, 50-3, 50-4, 50-5.

authority to lease the property. *Id.* at 5. Plaintiffs allege White River, Day Town, and SOG each produced Well Serial Number 163489 on State Lease 1462. *Id.* Plaintiffs also provided the dates of production and estimated production. *Id.* at 5.

Plaintiffs allege the previous suit only addressed production and royalties from 2003 prior through trial, which was held between January 20 and 30, 2015. *Id.* at 4. They assert any claims against the producers for their removal of Plaintiffs' oil remain ripe and unresolved. *Id.*

Plaintiffs further claim the *Crooks* district court ruling, which was affirmed in relevant part, held that the lease entered into by the State with Defendants are nullities. *Id.* at 5. Plaintiffs claim the State possessed neither ownership nor an executive right in the minerals to create a valid mineral lease. *Id.* Despite that fact, Defendants have continued to remove minerals without a valid lease or permission and have continued to pay royalties on those minerals to the State. *Id.* Plaintiffs' amendment includes more specific allegations concerning the production of the well on their property under the State lease, including dates and estimated production. *Id.* at 5-6. Plaintiffs claim they owned the oil that was produced, owned the land, and possessed the exclusive right to explore and produce minerals from their property. *Id.* at 6.

Plaintiffs further allege the Defendants were on notice as of the May 16, 2016 *Crooks* ruling, as well as through updates provided by the State of the litigation. *Id.* at 6-7. Plaintiffs allege that as owners of the minerals, they have a right of revendication to obtain a declaration of their ownership and an order requiring return

of the minerals. *Id.* at 8. Plaintiffs state it is undisputed Defendants received minerals from Plaintiffs that were not owed and are required to return the value of any minerals that have been alienated, along with the fruits and products without a reduction for expenses. *Id.* at 9.

White River and Day Town amended their original motion (ECF No. 35), to assert the Amended Complaint (ECF No. 50) fails to cure the deficiencies. ECF No. 56. White River and Day Town still seek a more definite statement to identify the property plaintiffs. And White River seeks dismissal of the revendicatory action against it because the amendment admits White River has not operated the property since January 31, 2021. ECF No. 56-1 at 2.

SOG seek dismissal of Plaintiffs' Amended Complaint (ECF No. 59). ECF No. 53. SOG argues that the claim for revendicatory action fails because the minerals are not subject to identification, and that the claim for recovery of a payment of a thing not owed fails because there was no transfer or direct relationship between Plaintiffs and SOG. *Id.* at 1.

Plaintiffs oppose all motions. ECF Nos. 42, 43, 51, 58, 59, 85, 86. Plaintiffs argue Defendants' motions are without merit, misstate law, that their claims have a basis in law and fact, and that the prior litigation does not bar their instant claims.

Following this Court's Jurisdictional Briefing Order (ECF No. 74), Plaintiffs filed a Second Amended and Restated Complaint ("Second Amended Complaint") (ECF No. 77) to properly allege the domiciles of members of White River and Day

Town.  The parties agreed to adopt the pending motions to dismiss as applicable to Plaintiffs' Second Amended Complaint.  ECF Nos. 80, 82.

## II.  Law and Analysis

### A.  Plaintiffs' allegations must raise a plausible right to relief.

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss all or part of a complaint for "failure to state a claim upon which relief can be granted."[4]  But a complaint should not be dismissed "if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal citation and quotation omitted).

A complaint or claim is "facially plausible" when the facts alleged "allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (internal citation and quotation omitted).  Factual allegations need not be detailed but must "raise a right to relief above the speculative level."  *Serrano v. Customs & Border Patrol, U.S. Customs & Border Prot.*, 975 F.3d 488, 496 (5th Cir. 2020).

In deciding a motion to dismiss, a court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff."  *Id.* at 496.  However, a court need not accept as true "'conclusory allegations, unwarranted factual inferences, or legal conclusions.'"  *Arnold*, 979 F.3d at 266 (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (internal citation and quotation omitted)).

---

[4] And Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Courts generally are limited to the complaint and its proper attachments in considering a motion to dismiss. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007) (citation omitted). Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000).

### B.    The Court takes judicial notice of prior state court proceedings.

There is a significant nearly 17-year history of related litigation concerning the property and mineral rights of the Catahoula Basin relevant to this suit. In May of 2006, Steve Crooks and Era Crooks (the "Crooks") initiated litigation in state court on behalf of a class of riparian landowners. *See Crooks v. State*, 2016 WL 3197532 (La. Dist. Ct. 2016). In June of 2007, William Sanders ("Sanders") initiated separate litigation in state court, which was then removed to this Court. *See Sanders v. Belle Expl., Inc.*, 481 Fed.Appx. 98 (5th Cir. 2011).

The Court takes judicial notice of the Louisiana state court decisions in *Crooks* and *Sanders*. *See Stiel v. Heritage Numismatic Auctions, Inc.*, 816 F. App'x 888, 892 (5th Cir. 2020) (the court may "take judicial notice of the public records in . . . prior state court proceedings"). A discussion of the decisions is pertinent to the instant motions before the Court.

9

1.    *Crooks v. Department of Natural Resources*

Essentially, the Catahoula Basin, which was commonly known as a "lake" was determined to be a river, preserving the ownership of the banks – the area between the ordinary low and high watermarks – for riparian landowners.  *Crooks v. State*, 2016 WL 3197532, at *5 (La. Dist. Ct. May 17, 2016), *aff'd in part, vacated in part*, 263 So.3d 540 (La. App. 3 Cir. 12/28/18), *writ granted*, 269 So.3d 691 (La. 5/6/19), *aff'd in part, rev'd in part*, 340 So. 3d 574 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9, 2020).  The Louisiana Third Circuit Court of Appeal iterated pertinent facts and procedural history as follows:

> In 1962, the United States began constructing various structures in and around the Catahoula Basin pursuant to a congressionally-authorized navigation project under the River and Harbor Act of 1960 to promote navigation on the Ouachita and Black Rivers. In association with the project, the State of Louisiana and the United States signed an "Act of Assurances." Under the Act of Assurances, the State agreed to:
>
> > a. Furnish free of cost to the United States all lands, easements, and rights of way, including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required;
> > ....
> > c. Hold and save the United States free from damages due to construction and maintenance of the project[.]
>
> In connection with the project, the Catahoula Lake Water Level Management Agreement (hereinafter called the Water Level Management Agreement) was also developed and signed by the United States Army Corps of Engineers; the Bureau of Sport Fisheries and Wildlife, Fish and Wildlife Service, United States Department of the Interior; and the Louisiana Wildlife and Fisheries Commission. The agencies confected the agreement to ensure that proper water level management would protect the wildlife and public recreational opportunities in the Catahoula Basin, including an area known as Catahoula Lake. Upon completion of the project in 1972, the record

indicates that the United States Fish and Wildlife Service began managing water levels in and around the Catahoula Basin in accordance with a seasonal schedule outlined in the agreement. As intended, these water management activities increased water levels in the Catahoula Basin and prolonged the natural annual high-water fluctuations. The record indicates that the United States Fish and Wildlife Service continues to manage the water levels in the Catahoula Basin to this day. Further, the record indicates that the State exercises jurisdiction of the Louisiana Department of Wildlife and Fisheries and has granted mineral leases in the area known as Catahoula Lake.

*Crooks v. State Through Dep't of Nat. Res.*, 350 So.3d 901, 904–05 (La. App. 3 Cir. 3/16/22), *writ granted*, 339 So.3d 621 (La. 6/22/22), and *rev'd*, 359 So.3d 448 (La. 1/1/23), *reh'g denied* (La. 3/16/23). The State, through the Department of Wildlife and Fisheries, granted mineral leases in the area known as Catahoula Lake. *Crooks v. Dep't of Nat. Res.*, 340 So.3d 574, 577 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9, 2020).

In 2006, the Crooks ("class plaintiffs") initiated a class action in state court against the Louisiana Department of Natural Resources ("LDNR") on behalf of a class of landowners in the Catahoula Basin whose property is affected by the increased water levels from the project. *Id.* The class was subdivided into "Lake Plaintiffs" and "Swamp Plaintiffs" depending upon the location of their properties. *Id.* at 906. Lake Plaintiffs were described as "seeking to have all lands between the ordinary low and ordinary high water mark of the Little River within the area known as Catahoula Lake to be declared owned by the class in accordance with Louisiana's laws of riparian ownership." *Id.* Swamp Plaintiffs were described as "owners of 'overflow lands' located in the southwestern portion of the Catahoula Basin. *Id.*

The Lake Plaintiffs argued that, though referred to as a lake, the area known as Catahoula Lake actually constitutes the banks of a body of water in the Catahoula Basin called Little River and thus is owned by the Lake Plaintiffs in accordance with Louisiana's laws of riparian ownership. They asserted that, prior to construction of the project and management of the water levels in the Catahoula Basin, Little River crossed the Catahoula Basin and seasonally overflowed its banks. They argued that, during overflow periods, Little River expanded across the entire Catahoula Basin and was mistakenly called Catahoula Lake. Thus, as detailed in the above quote, the Lake Plaintiffs sought to be declared owners of the area between the ordinary low water mark and the ordinary high water mark of Little River.

*Id.*

The district court granted the State's motion for partial summary judgment asserting legal status of the area as a lake. The landowners appealed. The Third Circuit Court of Appeal reversed and remanded. *See Crooks, et ux. v. State, Dep't of Nat. Res.*, 81 So. 3d 47 (La. App. 3 Cir. 12/7/11).

On remand, after bench trial,[5] the trial court found in favor of Class Plaintiffs that, in 1812, the area known as Catahoula Lake was a permanent river that seasonally flowed and covered its banks. *Crooks*, 263 So.3d at 556. The trial court found that the riverbanks consists of "22,813,84[sic] acres of lands located between the ordinary low water mark of the Little River and the ordinary high water mark of 36 mean sea level of the Little River." *Id.* at 553. The trial court thus recognized the Lake Plaintiffs as the owners of the riverbanks and ordered the State to pay damages for expropriation and mineral royalties received from production from the riverbanks

---

[5] A ten-day bench trial was conducted in January of 2015. The trial court issued its Written Reasons for Judgment on May 16, 2017. And the trial court rendered a final judgment in May of 2017. *Crooks v. State through Dep't of Nat. Res.*, 343 So.3d 248 (La.App. 3 Cir. 6/29/22), *writ denied*, 349 So.3d 2 (La. 11/1/22).

under the riverbank leases between May 2003 and the date of trial.[6]  *Crooks v. State Through Dep't of Nat. Res.*, 359 So.3d 448, 450 (La. 1/1/23, 1–2), *reh'g denied* (La. 3/16/23).  The trial court also denied the State's exception of no right of action.[7]  *Id.* The State appealed, asserting, among other errors, that the district court erred in determining the area is not a lake and in not setting the location of the ordinary low water mark to accurately determine the size of the allegedly taken property.  263 So. 3d at 540.

On appeal, the Third Circuit Court of Appeal affirmed in part, vacated in part, and rendered the judgment of the trial court.  *Crooks*, 263 So. 3d at 567.   The Third

---

[6] The judgment was silent as to the validity of the leases or the effect of its ruling on the existing leases.  The trial court held that the actions of the State in granting the leases on the immovable property and the continuing production of oil and gas from these leases is a continuing trespass on the immovable property of the plaintiffs and class members, constituting a continuing tort.  *Crooks*, 2016 WL 3197532, at *28.  Thus, the court found that plaintiffs and the class members are entitled to "repayment of all royalties and other payments received by the State derived from oil, gas, and mineral activities and production conducted on the immovable property of plaintiffs and members of the class" that was the subject of the proceedings.  *Id.*

The trial court determined that because the area is a permanent river the "Lake Plaintiffs" are "entitled to recovery the mineral royalties attributable to the riparian lands and which have been erroneously paid to the [S]tate over the years."  *Id.* at 45.  However, it was undisputed that plaintiffs only sought to recover the royalties attributable to these leases during the three years before suit was filed as well as royalties to the date of trial.  *Id.*  The amount of royalties was undisputed, and the court found the "riparian landowners are entitled and decreed the owners of those designated funds."  *Id.*  However, the trial court was silent regarding the leases themselves or the ownership of royalties attributable to future production post-trial.

[7] The trial court found that the United States is the party that inversely condemned the plaintiffs' land, but the Act of Assurances provided an agreement that the State became the indemnifor of the United States.  263 So. 3d at 549.  Thus, the trial court concluded plaintiffs as third-party beneficiaries could bring their inverse condemnation claims directly against the State.  *Id.* The trial court also concluded a subsequent purchaser can assert a right of action.  *Id.*  The trial court also denied the State's exception of liberative prescription, concluding that a one-year prescriptive period applied but that plaintiffs' inverse condemnation claims had not prescribed according to the continuous tort doctrine.  *Id.*

Circuit held that the State was prohibited from acquiring private property through acquisitive prescription; that evidence was sufficient that the area known as "Catahoula Lake" was actually a permanent river; that a one-year prescriptive period applied to the landowners' claims; that the State failed to establish that subsequent purchasers lacked a right of action for inverse condemnation; and that the landowners were not entitled to attorney's fees. *Id.* at 540. The Third Circuit noted that one of the State's arguments on appeal was that the trial court erred in not setting "the location of the ordinary low water mark to accurately determine the size of the allegedly taken property." *Id.* at 552. It affirmed the trial court's rulings relating to the acreage and value per acre, and found no abuse of discretion in the trial court's determination of damages. *Id.*

The Third Circuit vacated the trial court's award of attorney's fees, costs, and fees, finding that La. R.S. 13:5111 did not apply. *Id.* at 565. It ordered an award of attorney's fees, an amount for administration of the claims process post-trial, an incentive award to Crooks assessed against the common fund under La. Code Civ. P. art. 595, and an award of expert witness fees and costs rendered against the State. *Id.* at 567. The judgment was otherwise affirmed. *Id.* The State was granted writ of certiorari and filed peremptory exceptions of prescription and no cause of action. *Crooks v. Dep't of Nat. Res.*, 340 So.3d 574 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9, 2020).

On certiorari review, the Louisiana Supreme Court overturned the landowners' inverse condemnation claims as barred by prescription, but it left intact

the ruling that the Catahoula Basin is a river rather than a lake, and it overruled the State's exceptions of no cause of action as to mineral royalties. *Crooks*, 340 So.3d at 587. In addressing the procedural history after the final judgment, the Louisiana Supreme Court observed:

> After all legal delays expired, the judgment became final ("the Royalties Judgment").
>
> When LDNR failed to satisfy the Royalties Judgment, Class Plaintiffs sought a mandamus to enforce its payment arguing that depositing funds into the registry of the court to comply with a final judgment is a ministerial act. LDNR opposed arguing that mandamus violates La. Const. art. XII, § 10(C) and La. R.S. 13:5109(B)(2) and that the funds sought were unavailable. The trial court denied the writ of mandamus. The court of appeal reversed, finding that mandamus is an appropriate remedy as the funds sought were not public funds and the judgment could not be enforced by ordinary means. *Crooks,* 21-0663, pp. 10-11, 350 So.3d at 909–10.

*Crooks*, 359 So.3d at 450.[8]

The State applied for a writ, which was granted. 339 So. 3d 621 (La. 6/22/22). The issue before the Louisiana Supreme Court was whether mandamus may lie to satisfy the payment of the Royalties Judgment. *Crooks*, 359 So. 3d at 450. The Louisiana Supreme Court recognized that Class Plaintiffs were entitled to payment of the Royalties Judgment. *Id.* at 451.

However, the Louisiana Supreme Court reversed the court of appeal and reinstated the trial court judgment, rejecting the court of appeal's finding that the funds subject to the Royalties Judgment were not public funds thus warranting

---

[8] "While the [Louisiana Supreme Court] specifically overruled the sums awarded for inverse condemnation, it did not make any statements regarding the mineral royalty award, but did state, "In all other respects, the judgment is affirmed." *Crooks*, 343 So.3d at 256.

mandamus.  *Id.* at 452.[9]  Rehearing was denied.  *Crooks v. State Through Dep't of Nat. Res.*, 2022-00625, p. 1 (La. 3/16/23).

The *Crooks* case proceeded in state court to resolve further issues.[10]  Plaintiffs sought partition of the property of the individual plaintiffs based on the final judgment and its attached map, including a request to delineate the boundaries of both the riverbed and river bank, and to partition the acreage of riparian land to provide each owner with a proportionate share.  *Crooks v. State through Dep't of Nat. Res.*, 343 So.3d 248, 256 (La.App. 3 Cir. 6/29/22), *writ denied*, 349 So.3d 2 (La. 11/1/22).  The trial court denied the State's exception for unauthorized use of a summary proceeding, granted the landowners' exception of *res judicata*, made rulings on motions in limine and to exclude or limit expert testimony, and made findings on the ordinary low water mark of the river.  *Id.* at 248.

The State asserted at the trial level that "future royalties were not part of the trial court judgment and do not belong to the Class but will belong to the proper

---

[9] The court stated that the funds received from the mineral leases were public funds as they were deposited into the State's general fund and are not subject to seizure.  *Id.*  The court stated that the Royalties Judgment is payable only when funds are appropriated by the legislature; thus, the court of appeal erred in issuing the writ of mandamus.  *Id.*

[10] The Third Circuit noted that the record resumed with the appeal of "what began with Plaintiffs' Motion Regarding Issues on Remand (With Incorporated Memorandum of Authorities)" filed on July 6, 2020.  343 So.3d 248 at 256.  It should be noted that Westlaw shows this ruling, 343 So. 3d 248, as an appeal of *Crooks*, 350 So. 3d 901, which was the appeal of the trial court's denial of a writ of mandamus to compel payment of the judgment and for sanctions.  However, that appears to be incorrect.  Notably, none of the parties seem to address this ruling which found the ordinary low water mark to be 24.08 MSL, as affirmed by the Third Circuit.

16

landowners once boundaries are established."[11]  *Id.* at 257.  "On June 17, 2021, the trial court rendered a judgment following a June 4, 2021 hearing on the plaintiffs' motion regarding issues on remand."  *Id.* at 257.  The trial court denied plaintiffs' motion for mandamus or contempt and granted plaintiffs' motion "to determine the low-water mark of the Little River within two months."  *Id.*  It denied the State's request for additional time set for trial the issue of the low-water mark.  *Id.* at 257-58.

Following a hearing on August 10, 2021, the trial court rendered judgment denying the State's exception for unauthorized use of summary proceeding, granting the plaintiffs' exception of *res judicata*, denying the plaintiffs' motion to exclude the testimony of the State's expert witnesses, and finding that the ordinary low-water mark of the Little River within the Catahoula Basin is 24.08 feet above MSL.  *Id.* at 261.  It further found that "the contours of that ordinary low water mark of 24.08 feet above MSL are shown on the surveys prepared by Michael Mayeux and introduced into evidence as Exhibits P-11 and P-12," which were adopted as part of the judgment and attached."  *Id.*  The State appealed and filed exceptions of lack of subject matter jurisdiction no cause of action on appeal."  *Id.* at 261.

On appeal, the Third Circuit noted that "[w]hile it has already been held that the body of water in question is a river rather than a lake, the low-water mark needed to be determined in order to classify what belonged to the riparian owners versus

---

[11] The State did not dispute the finality of the judgment for an award of past royalties.  343 So.3d at 257.

what was owned by the State." *Id.* at 254.  The trial court determined the low-water mark to be at 24.08 feet in the Little River located in the Catahoula Basin.  *Id.*

The Third Circuit denied the State's exceptions and affirmed in part and reversed in part the trial court's ruling.  *Id.* at 261.  The Third Circuit noted that the Louisiana Supreme Court rendered final judgment when it affirmed that the Catahoula Basin is actually a river, and it did not remand the case for any proceedings.  *Id.* at 266.  And it noted that the final judgment did not address the boundary issue or remand for a determination of the boundary issue of the low-water mark.  *Id.*  The Third Circuit held that the trial court proceedings were not "summary proceedings," but merely a "continuation of the ordinary proceedings instituted in 2006 when the initial petition stated it was a class action petition to fix boundary." *Id.* at 268.

The Third Circuit held that the trial court legally erred in granting plaintiffs' exception of *res judicata*, noting that the relationship of the exact location of the low-water mark to the location of gas wells had not been litigated.  *Id.* at 273.  The Third Circuit found that the former trial court did award mineral interests attributable to mineral production from May 2003 through the date of trial, but made no finding as to the location of the gas wells in relation to the low-water mark.  *Id.*  It observed that the location of the wells are a matter of public record.  *Id.*  But the court found no evidence in the entire record in the case of any finding by the former trial court regarding the low-water mark based on scientific evidence and the location of the gas

wells.  *Id.*  The Third Circuit further noted the trial court provided no discussion or written reasons for granting plaintiffs' exception of *res judicata*.  *Id.*

The Third Circuit stated that the sole purpose of the August 10, 2021 hearing was to determine the location of the low-water mark.[12]  *Id.*  The trial court found the plaintiffs' witnesses' testimony reliable and corroborated by data, and it accepted the testimony that the low-water mark is 24.08 feet.  *Id.* at 279.  The Third Circuit noted that none of the State's witnesses would testify as to an exact low-water mark.  *Id.* at 274.  After reviewing the State's proffered witness testimony, the Third Circuit held that the trial court did not err in excluding testimony of the State's witnesses, who all admitted at the hearing that they could not give an elevation representing the low-water mark.  *Id.*  The Third Circuit found no error in the trial court's factual finding, and affirmed, that the low-water mark is located at 24.08 feet.  *Id.* at 281.  It reversed the trial court's grant of *res judicata.*  *Id.*  The Louisiana Supreme Court denied writs.  349 So.3d 2 (La. 11/1/22).

### 2.   *Sanders v. Belle Exploration, Inc.*

In a related case brought solely against Belle, this Court conducted a three-day bench trial and entered judgment in favor of Belle.  *Sanders v. Belle Expl., Inc.*, 481 Fed.Appx. 98, 100 (5th Cir. 2011).  In July 2000, William Henry Sanders ("Sanders") and his wife, along with Ricky Shirley and Dana Shirley (the "Shirleys"),

---

[12] The Third Circuit noted that it "did not disagree that the legal conclusion must be that the profit from the wells already awarded was above the yet-to-be-determined low water mark, it could not substitute that legal finding for the scientific one that establishes the *actual* low water mark, the sole reason for the hearing.  343 So.3d at 273.  It acknowledged that the previous award of mineral interests is, however, *res judicata.  Id.* at n.3.

executed a lease in favor of Belle applicable to all their lands and mineral interests in Sections 25 and 30 of LaSalle Parish,[13] retaining a one-fifth royalty interest in any mineral production from the leased lands.  Reasons for Judgment, ECF No. 65 at 1, *Sanders v. Belle Exploration, Inc.*, No. 1:07-cv-01108 (W.D. La. 5/3/2/10).

> In 2002, the Louisiana State Mineral Board (the "Mineral Board") passed two resolutions concerning the land at issue here. The resolutions conceded to private ownership of mineral rights in all lands above the thirty-six foot mean sea level contour in certain parcels in the vicinity of Catahoula Lake, including some of the Leased Lands. At nearly the same time, the Louisiana Commissioner of Conservation (the "Commissioner") ordered the forced pooling and unitization of property including the Leased Lands, resulting in the creation of numbered sand units ("SU") 116 through 122. This case concerns SU 117 and SU 118. SU 117 includes portions of the Leased Lands adjacent to Catahoula Lake; SU 118 does not.

*Sanders*, 481 Fed.Appx. at 100.[14]

Sanders filed suit in state court against Belle, alleging Belle had improperly determined the boundary between his property and the State's in and around Catahoula Lake, resulting in underrepresentation of the Sanders's interest, and that Belle had breached the lease by failing to pay royalties.[15]  *Sanders*, 481 Fed.Appx. at 100.  Belle removed to federal court, and judgment was issued after a bench trial.  *Id.*

---

[13] Sanders owns lands and mineral interests in Sections 25 and 30, along with the Shirleys. *Sanders*, 481 Fed.Appx. at 100.

[14] Notably, the Fifth Circuit relied on the parties' agreement that the Catahoula Lake is a navigable lake and the presumption that the State owns all the lands and mineral rights up to the ordinary high water mark of a navigable lake such as this one.  481 Fed.Appx. at 100, n.1.

[15] In its denial of partial summary judgment, this Court recognized that in prior state court litigation, the Twelfth Judicial District Court rendered partial judgment in June 2005, in favor of Sanders and against the State, recognizing Sander's mineral ownership and possession of land in Section 30 (as well as Lot 1 of Section 25) "situated above the 36' mean sea level contour."  That judgment became a final judgment but did not resolve all of the

This Court agreed with Belle that the proper reference for the boundary line between the Sanders's interest in SU 117 and the State's is a 1942 survey conducted under the Louisiana Department of Public Works. *Id.* at 101. Sanders sought to use a 2001 survey he ordered, which would have expanded the leased land. *Id.* This Court relied on a Louisiana Third Circuit case, *Sanders v. State*, 973 So. 2d 879 (La. App. 3 Cir. 12/19/07),[16] and its own assessment of the evidence after a full trial. *Id.* at 102. This Court determined that the 1942 survey line was the more , boundary line between the State's and the Sanders's land, even though it was a meander survey. *Id.* And it was determined that the ordinary high-water mark of Catahoula Lake is thirty-six-feet MSL contour. *Id.* at 100. The State owns all land and mineral rights up to the ordinary high-water mark of a navigable lake such as Catahoula Lake. *Id.*

This Court found that Sanders was barred from a redetermination of the 36-foot MSL contour line against Belle, even though Belle was not a party to the Third Circuit suit in which that issue was decided. Reasons for Judgment, ECF No. 65 at 9, *Sanders v. Belle Exploration, Inc.*, No. 1:07-cv-01108 (W.D. La. 5/3/2/10). This Court clarified that the 36-foot foot MSL contour boundary applies to both surface and mineral ownership. *Id.*

---

issues in that case. *Sanders*, 2008 WL 11381933, at *2. But this Court recognized that the final judgment did not specify how the contour line was to be determined. *Id.* at 3.

[16] In *Sanders v. State,* 973 So.2d 879, the Louisiana Court of Appeals for the Third Circuit reversed a possessory judgment in favor of Sanders and against the State of Louisiana as to the lands between the thirty and one-tenth feet MSL and thirty-six feet MSL. *Id.* at 880. The Louisiana court held that "the ordinary high water mark [of Catahoula Lake] in 1812 was 36 feet MSL as surveyed by Heard and Daigre in 1942." *Id.* at 887.

On appeal, the United States Fifth Circuit held that this Court reasonably relied on the 1942 survey that determined the approximate location of the lake and plotted sinuosities of the shoreline even though the survey utilized a meander line. *Sanders*, 481 Fed.Appx. at 98.[17]

### C.    Plaintiffs fail to state a claim for revendicatory relief.

Defendants seek dismissal of Plaintiffs' revendicatory action for failure to state a claim.  ECF Nos. 35, 36, 53, 56, 80, 82.   White River and Day Town argue that Plaintiffs cannot state a claim "for all oil that has previously been sold to date[.]"  ECF No. 35-1 at 4.  White River and Day Town further argue that the Amended Complaint admits White River has not operated the property since January 31, 2021 and as such Plaintiffs have no revendicatory action against White River.  ECF No. 56-1 at 3.

SOG argues Plaintiffs fail to state claims for a revendicatory action because they do not seek return of specific property.  ECF No. 36-1 at 6.  SOG contends Plaintiffs fail to identify the oil at issue, and if they did, there would be no way to identify it and return it. ECF Nos. 36-1 at 10, 53-1 at 11. SOG does not concede Plaintiffs had an ownership interest in the oil of which they seek return.  ECF No. 53-1 at 8.  It asserts the oil and gas is incapable of the sort of identification and segregation as other fungible property that would allow it to be the subject of revendication.  *Id.* at 8-9.  Invoking the "rule of capture," SOG argues the operator becomes the owner once the oil and gas is removed from the wellhead.  *Id.*  SOG asserts only one case recognized a revendicatory action related to minerals removed

---

[17] The Fifth Circuit also declined to entertain Sanders' unconstitutional taking argument on appeal, as it was never made to the district court.  *Sanders*, 481 Fed.Appx. at 103.

without a landowner's consent, but it was overruled by the Louisiana Supreme Court. *Id.* at 9 (citing *Taylor v. Woodpecker Corp.*, 552 So.2d 81 (La. 3 Cir. 11/8/89), *rev'd*, 562 So.2d 888 (La. 1990).

Plaintiffs opposed and filed an Amended Complaint (ECF No. 50) to allege Defendants acted in bad faith by paying royalties to the State, even after it was on notice the State did not own the land and received Plaintiffs' formal demand to cease paying royalties to the State.  ECF No. 43 at 2, 11.  Plaintiffs further argue that they claim revendicatory relief only for the oil still in possession of Defendants.  *Id.* at 2-3.

Plaintiffs respond that the Amended Complaint (ECF No. 50) cures Defendants' challenges.  ECF Nos. 42 at 1, 43 at 2.  Plaintiffs state the amendment clarifies the revendicatory action claim by alleging that they seek return of the oil owned by Plaintiffs "that is still in Defendants' possession."  ECF Nos. 42 at 4-5; 43 at 5.  They assert no dismissal is necessary as to a revendicatory action for "all minerals previously sold."  *Id.*  Plaintiffs contend that the amendment and its attachments sufficiently allege that they the return of any minerals removed from their property that are still in Defendants' possession.  ECF No. 43 at 2-3.

Plaintiffs further assert the amended allegations specifically identify the exact wells and date for production and allege that Defendants' record keeping allows for tracking the oil.  ECF Nos. 42 at 3, 43 at 6, 51 at 10.  Plaintiffs state that while White River may presumably have sold all of the minerals it took from their property, Plaintiffs must pursue the revendicatory action until that's admitted or evidenced.

ECF No. 58 at 2.  Plaintiffs also assert a revendicatory action may be asserted for fungible property.  ECF No. 59 at 7-8.

A claim for dispossession of property may arise under La Civ. Code art. 526.  It states: "The owner of a thing is entitled to recover it from anyone who possesses or detains it without right and to obtain judgment recognizing his ownership and ordering delivery of the thing to him."  A claim under this article is known as a revendicatory action, and it is considered a real action rather than a personal action. *Zadeck v. Treme*, 2022 WL 4280296, *5 (W.D. La. Sept. 15, 2022).  The Louisiana Supreme Court has determined that the revendicatory action is an action for the recovery of a moveable transferred: (1) by the owner or legal possessor to a person in bad faith; (2) for less than fair value; or (3) when the moveable was lost or stolen. *Dual Drilling Co. v. Mills Equipment Investments, Inc.,* 721.2d 853 (La.12/1/98).

When the defendant is no longer in possession of a plaintiff's property, then the proper remedy is a delictual action in tort (conversion) for the fair market value of the property at the time it was converted. *Gibbs v. Harris*, 799 So.2d 665, 670 (La. App. 2d Cir. 2001).  Because this right to revendication is predicated on a defendant maintaining possession of the property, a revendicatory action "abates when the movable is no longer in possession of the defendant." *Dual Drilling Co.*, 721 So. 2d at 853, n.1.  But a plaintiff may have a personal action for damages or unjust enrichment against the former possessor of the movable.  *Id.*

Here, Plaintiffs' Amended Complaint (ECF No. 50) seeks to recover the oil produced from their land.  Plaintiffs assert Defendants removed minerals from their

property in LaSalle Parish.  ECF No. 50 at 1.  They claim that despite judgments holding Plaintiffs to be the owners of both the land and mineral rights, Defendants have continued to take minerals from their land without compensation.  *Id.*  Plaintiffs allege Defendants have produced oil from their property under an invalid lease with the State.  *Id.* at 7-8.  Plaintiffs claim that the leases are nullities based on the ruling in *Crooks*, but Defendants continue to remove minerals without a valid lease or permission and continue to pay royalties to the State.  *Id.* at 8.

Specifically, Plaintiffs allege they seek recovery, individually, against all Defendants for all production obtained by each well on Plaintiffs' property as recovery for property taken under La. Civ. Code art. 526 and 488.  Plaintiffs allege Day Town, White River, and SOG produced well Serial Number 163489 on State Lease 1462.  *Id.* at 5.  Plaintiffs alleged the specific dates of production and estimated quantity of production.  *Id.*

Plaintiffs claim Defendants are in possession of records that allow them to identify the oil produced from the Plaintiffs' wells, and to determine whether it is still in their possession or has been alienated.  *Id.* at 5.  Plaintiff further allege the State sent a letter to producers to escrow royalties from the leases because the State is not a valid lessor of the minerals.  *Id.* at 6.

Through their amended allegations, Plaintiffs add that Defendants were in bad faith for removing the minerals from their property, as the ownership of the land was placed in question as early as May 2006, and the district court found Plaintiffs (and not the State) to be the owners on May 16, 2016.  *Id.* at 6.  Plaintiffs allege the findings

were affirmed in 2020 and that the rulings were a matter of public record that placed Defendants on notice. *Id.* Plaintiffs further allege Defendants received actual notice from the State of the litigation and rulings. *Id.* at 7. Thus, Defendants were without right to remove the minerals under null leases granted by a third-party (the State). *Id.* at 5.

To sustain a cause of action under La. Civ. Code art. 526, Plaintiffs must have ownership of the property on which they base their claims. But they do not own the fugitive minerals themselves until they have been reduced to possession. La. R.S. 31:6-7. Plaintiffs seek recovery of the minerals removed from their property. ECF No. 50. The alleged minerals themselves would not be classified as fruits, but would be a product, as it is derived "as a result of a diminution of its substance." *Todd v. State, Through Dep't of Nat. Res.*, 474 So.2d 430, 434 (La. 1985).

Under La Civ. Code art. 488:

Products derived from a thing as a result of diminution of its substance *belong to the owner of that thing*. When they are reclaimed by the owner, a possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.

La. Civ. Code art. 488 (emphasis added).[18] Thus, a possessor in good faith, who may keep fruits, must return products to the owner on demand, but is entitled to reimbursement of his expenses. *Todd*, 474 So.2d at 434 (citing La. Civ. Code art. 488).

_____

[18] The United States Court of Appeals for the Fifth Circuit recently noted that under Article 488, "a landowner may recover products taken from his land without his consent[.]" *Mary v. QEP Energy Co.*, 24 F.4th 411, 418 (5th Cir. 2022), *cert. denied*, 143 S.Ct. 93; 214 L.Ed.2d 18 (2022). In *Mary*, the Fifth Circuit found that the gas at issue was not taken from the landowner's land, but was produced from a well located on the neighbor's land. *Id.* However, the Fifth Circuit observed that even if the well "ultimately drained gas from Marys' land, Article 14 of the Mineral Code would bar the Marys from recovering the value of this gas."

However, the provisions of the Mineral Code control in the event of a conflict between its provisions and those of the Civil Code.  La. R.S. 31:2.  Where the Mineral Code does not expressly or impliedly provide for a particular situation the Civil Code or other laws are applicable.  *Id.*

The parties agree all of the wells from which they allege minerals were produced are unitized.  ECF Nos. 50 at 4, ECF No. 60 at 2.   Even absent admission that the wells are unitized, the Louisiana Department of Conservation may utilize unitization without the consent of a particular landowner.  This Court has recognized that:

> the Commissioner of Conservation has the power to establish drilling units and designate a drilling site at the optimum position in the drilling unit for the most efficient and economic drainage of such unit.  The Commissioner must also issue a permit before the well can be drilled, and the issuance of the permit . . . is sufficient authorization to the holder of the permit to enter upon the property by the permit and to drill in search of minerals thereon.

*Chesapeake Operating, Inc.*, CIV.A. 12-0044, 2012 WL 2049922, at *3 (W.D. La. June 6, 2012) (internal quotations omitted).  The Court has also observed that:

> [U]nitization takes place pursuant to a permit of the Commissioner of Conservation and not the consent of the landowner. A landowner cannot prevent the establishment of a unit and, in fact, a unit can be established directly against the wishes of a landowner. A landowner in a unit does not have the right to choose the operator of the unit or the location of the drilling site. Moreover, a landowner is not allowed to keep all of the production from drilling on his property. Rather, he must share the production with the others in his unit.

---

*Id.* at n.23 (finding no clear path to disgorgement under the plain language of the Code where energy company's pipelines strayed outside of a servitude granted by landowners).

*Id.* at 4.[19]

The Mineral Code provides a statutory scheme upon which an unleased owner must rely for protection of its rights in the absence of a lease or contract with the operator. *See B.A. Kelly Land*, 25 F.4th at 379-80.  When the operator has no contract with an interest owner in a compulsory unit, the forced pooling statutory regime establishes a "quasi-contractual relationship," whereby the legislature provides the terms of the contract, such as how to allocate well costs, how to allocate production or the proceeds of production, and how the operator should provide an accounting of production, costs, and revenue. *Wells*, 89 So. 3d at 1149 ("A quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract," and "Louisiana jurisprudence provides that a claim against the operator of a unit well brought by the owners of unleased mineral interests in the production unit seeking their statutory share of production from the well is grounded in quasi-contract.").

Neither the parties nor the Court found jurisprudence recognizing a revendicatory action in the context of a claim for the return of the extracted oil and gas.  And the cases cited by Plaintiffs in support of revendicatory action in this context are inapposite.

---

[19] "A drilling and production unit combines all the land over a reservoir into a single "unit" and allocates all the production from it to the various landowners. The Commissioner of Conservation determines the percentage of production allocated to each landowner. Generally, the percentage corresponds to the proportion of each owner's land in the unit." *Gladney v. Anglo-Dutch Energy, L.L.C.*, 2016-468, p. 3 (La.App. 3 Cir. 12/21/16); 210 So.3d 903, 905, *writ denied*, 2017-0365 (La. 4/13/17); 218 So.3d 120.

In reviewing the Amended Complaint, and accepting the factual allegations as true, Plaintiffs fail to allege a plausible revendicatory action against Defendants.

### D.  <u>Plaintiffs' claims have not prescribed.</u>

SOG argues Plaintiffs' causes of action under La. Civ. Code arts. 2305 and 2299 are barred by a ten-year prescriptive period.  ECF No. 36-1 at 15-17.  SOG argues Plaintiffs cannot circumvent the three-year prescriptive period by characterizing their claims as "breach of contract," but regardless, are subject to a ten year prescriptive period for their quasi-contract claims.  ECF No. 46-1 at 15-16.  SOG argues Plaintiffs – who were included within the *Crooks* class action – were well aware of the nature of their ownership claims of the underlying land, as well as the fact that they were subject to mineral leases entered into by the State, for decades prior to filing suit.  *Id.* at 17.  Thus, SOG contends Plaintiffs knew as early as December 7, 2011, if not much earlier, of the basis for their purported claims for failure to pay oil royalties.  *Id.*  SOG asserts Plaintiffs failed to bring any action until December 30, 2021, after the ten-year prescriptive period passed.  *Id.*

Plaintiffs admit prescription on any quasi-contractual claims would be ten years.  ECF No. 43 at 15.  Plaintiffs seek to recover the value of any oil produced ten years back from the date of filing of the Complaint – December 30, 2021 – forward. *Id.*  Plaintiffs argue that they allege they seek production at issue within ten years of filing.  *Id.* at 15.

A claim for payment of a thing not owed sounds in quasi-contract. *Carriere v. Jackson Hewitt Tax Serv. Inc.*, 750 F.Supp.2d 694, 710 (E.D. La. 2010) (citing *Onstott*

*v. Certified Capital Corp.,* 950 So.2d 744, 747 (La.App. 1 Cir. 11/3/06); *Julien v. Wayne,* 415 So.2d 540, 542 (La.App. 1 Cir.1982)). Similarly, a claim for unjust enrichment is quasi-contractual. *Gulfstream Services, Inc. v. Hot Energy Services, Inc.,* 04–1223 (La.App. 1 Cir. 3/24/05), 907 So.2d 96, 100, *writ denied,* 05–1064 (La.6/17/05), 904 So.2d 706.

"Claims that are quasi-contractual in nature, such as a claim for production or the proceeds of the sale of production from a forced pool unit, are subject to the general ten-year period for personal actions." *Dow Constr., LLC v. BPX Operating Co.*, 603 F.Supp.3d 442, 446 (W.D. La.2022) (citing *Wells v. Zadeck*, 2011-1232 (La. 3/30/12), 89 So. 3d 1145, 1149; *Taylor v. Smith*, 619 So. 2d 881, 886–88 (La. App. 3 Cir. 1993)); *see also Weyerhaeuser Co. v. Pardee Minerals, LLC*, 2018 WL 3210027, at *3 (W.D. La. June 28, 2018) ("Actions for payment of a thing not due are personal actions which prescribe ten years from the date of payment or ten years from the date that plaintiff knew or should have known of the overpayment."). "Generally, prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it; thus, of two possible constructions, that which favors maintaining, as opposed to barring an action, should be adopted." *Wells v. Zadeck*, 2011-1232 (La. 3/30/12, 6–7); 89 So.3d 1145, 1149 (citations omitted).

Here, the parties agree that a ten-year prescriptive period applies to Plaintiffs' quasi-contractual claims under La. Civ. Code arts. 2305 and 2299. Plaintiffs' allegations clearly seek relief under quasi-contractual theories. ECF No. 50. Plaintiffs seek payment for Defendants' production over the last ten years under

allegedly invalid mineral leases subsequent to Defendants being put on notice that the State's ownership was in question and the 2016 Third Circuit ruling holding that Plaintiffs are the owners.  ECF No. 50.  Plaintiffs seek the value of the minerals alienated by Defendants over the course of the ten years preceding the filing of their Complaint.  The Court finds Plaintiffs have alleged sufficient facts to survive a prescription challenge.

### E.    Plaintiffs state sufficient claims under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed.

SOG contends that Plaintiffs fail to state claims under La. Civ. Code arts. 2299 and 2305.  ECF Nos. 36-1 at 10, 53-1 at 11.  SOG argues Plaintiffs' claims under La. Civ. Code arts. 2299 and/or 2305 fail because Plaintiffs must allege they have no other right of action.  ECF No. 36-1 at 10.  SOG states that, regardless, Plaintiffs' claims fail because they admit SOG had a justification for its enrichment.  *Id.* SOG contends that Plaintiffs have alleged substantive claims against the State in the underlying state Court action, wherein the Louisiana Supreme Court held that Plaintiffs had claims for inverse condemnation and an action to recover production proceeds against the State.  *Id.* at 12.  SOG further contends that the allege "enrichment" was through a valid contract with the State.  *Id.* at 14.  SOG argues Plaintiffs fail to allege any extra-contractual action was taken by SOG or any sort of collusion or wrongdoing by SOG with the State.  *Id.* at 15. Thus, SOG contends Plaintiffs cannot state a claim for unjust enrichment.  *Id.* at 14-15.

SOG also contends Plaintiffs fail to state claims under art. 2299 because they fail to allege a direct relationship or any direct transfer of any payment between

31

Plaintiffs and SOG.  ECF No. 53-1 at 11-12.  Plaintiffs respond that a cause of action lies under the civil code articles for payment not due yet where Defendants disposed of produced oil.  ECF No. 59 at 14-16.  Plaintiffs argue that as owner of the land, they have the exclusive right to explore the minerals under their land.  ECF No. 53-1 at 8. They contend they became the owners of the oil once it was taken from into possession from the land they owned, citing La. R.S. 31:6.  *Id.*  Plaintiffs claim they are entitled to its return, not the State.  *Id.* at 17.

Plaintiffs assert that all of the wells at issue in this matter are unitized and that Louisiana courts recognize the rights of landowners in drilling units where minerals have been produced and the unleased owners have not been paid, but the leases were granted by other landowners in the unit.  ECF Nos. 50 at 4, 43 at 13 (citing cases recognizing a quasi-contract cause of action).  Plaintiffs assert the unit producers (here Defendants) owe them as the unleased owners the value of production under receipt of a thing not due.  *Id.*

Plaintiffs filed an Amended Complaint (ECF No. 50) to include the assertion that Defendants have continued to remove minerals from Plaintiffs' property in bad faith despite notice after *Crooks*.  ECF No. 50 at 6-7.

Plaintiffs respond to SOG's arguments, asserting they mischaracterize Article 2299 as it is not limited to formal "payments."  ECF No. 43 at 1, ECF No. 59 at 13. Plaintiffs allege SOG directly "received" the oil by personally removing the minerals from the ground.  ECF No. 59 at 13.  Plaintiffs note the article imposes a duty of reimbursement on "a person who received a payment *or* a thing not owed."  *Id.* at 14

(emphasis added by Plaintiffs). Thus, Plaintiffs claim no actual "payment" is required, but the same facts give rise to a quasi-contractual claim when a person receives a "thing" not owed. *Id.* at 15-16. And Plaintiffs allege that SOG as a producer directly "received" the oil from Plaintiffs' property that were not "owed." *Id.* at 20. Plaintiffs also argue that they do not allege fraud or any torts claims, but allege that the State had no interest in the oil and gas to grant any leases to SOG to remove the minerals. *Id.* at 17. Thus, Plaintiffs claim the oil was removed by SOG without right but not "owed." *Id.*

SOG responds that it is the lack of transfer from the Plaintiffs to Defendants that remains deficient. ECF No. 60. SOG contends that it is the State who possessed the land at the time and leased the land, acting as a conduit. *Id.* at 5-6.

"Article 2299 requires that the thing not owed must be restored to the person from whom it was received." *United States v. Cytogel Pharma, LLC*, 2018 WL 5297753, at *10 (E.D. La. Oct. 25, 2018).[20] "Louisiana courts have held Article 2299 'is limited to the situation in which one person gives something of value to another because of a perceived obligation to that other, when in fact no obligation exists. It does not apply when a third party, who is not acting as the agent of either the giver or the receiver is the conduit.'" *Id.* "Louisiana Civil Code Article 2303 provides that, if the receipt was in bad faith, the receiver must restore not only the thing not owed,

---

[20] Under La. Civ. Code art. 2300, "[a] thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist."

but also its fruits and products.  This article does not create a cause of action in a third party." *Id.*[21]

Article 2304 states:

> When the thing not owed is an immovable or a corporeal movable, the person who received it is bound to restore the thing itself, if it exists. If the thing has been destroyed, damaged, or cannot be returned, a person who received the thing in good faith is bound to restore its value if the loss was caused by his fault. A person who received the thing in bad faith is bound to restore its value even if the loss was not caused by his fault.

La. Civ. Code art. 2304.  But "[a] person who in good faith alienated a thing not owed to him is only bound to restore whatever he obtained from the alienation." La. Civ.

---

[21] Concerning this issue, the United States District Court of the Eastern District of Louisiana observed:

> Additionally, the case law on this particular issue, though sparse, suggests that it is arguable at best as to whether McDowell can be held liable for payment of a thing not owed. *See Soileau v. ABC Ins. Co.*, 02-1301 (La. App. 3 Cir. 10/3/03)*Soileau v. ABC Ins. Co.*, 02-1301 (La. App. 3 Cir. 10/3/03); 844 So. 2d 108 (agreeing with the trial court that Article 2299 "does not apply when a third party, who is not acting as the agent of either the giver or the receiver is the conduit" but also that Article 2299 is "limited to the situation in which one person gives something of value to another because of a perceived obligation to that other, when in fact no obligation exists" and that "the direct relationship of two parties interacting, one as the giver of a payment or thing and the other as the recipient of a payment or thing" is an "essential element" of an Article 2299 claim); *see also Gallo v. Gallo*, 03-794 (La. 12/3/03)*Gallo v. Gallo*, 03-794 (La. 12/3/03); 861 So. 2d 168 (upholding the denial of a claim for payment of a thing not owed where the defendant-mother was deemed not to have received any payment from the plaintiff-father for child support payments that he had made for a child that turned out not to be his and noting that "because the child support payments were received by the child, through the mother, the mother was not a person who received a payment not owed her, a requirement imposed by [Article] 2299 for reimbursement to be made"); *cf. Stewart v. Ruston La. Hosp. Co. LLC*, No. 14-83, 2016 WL 1715192, at *9 (W.D. La. Apr. 27, 2016) (James, J.) (finding Article 2299 to be "inapplicable" because the defendant "did not receive any payment whatsoever" from the plaintiffs).

*Galliano Marine Serv. LLC v. Schumacher*, CV 17-9868, 2018 WL 3727762, at *3 (E.D. La. Aug. 6, 2018).

Code art. 2305. "If he received the thing in bad faith, he owes, in addition, damages to the person to whom restoration is due." *Id.*

"The dispossessed owner of a movable may have, apart from the revendicatory action, a claim for the return of the movable or its value under the rules of the Civil Code governing the payment of a thing not owed." 2 La. Civ. L. Treatise, Property § 13:13 (5th ed.) (citing La. Civ. Code art. 2299; *Busse v. Lambert*, 773 So.2d 182 (La. Ct. App. 5th Cir. 2000)). "Anyone enriched without cause at the expense of another is under a quasi-contractual obligation to restore corporeal movables, if they remain, and if they no longer exist, to account for the enrichment." *Id.* (citing La. Civ. Code arts. 2304, 2306).

Here, to the extent the oil has been sold, Plaintiffs seek recovery of the value of the oil under La. Civ. Code arts. 2299, 2303, 2304, and 2305. ECF No. 50 at 8. Plaintiffs allege plausible claims for recovery of a thing not owed. Plaintiffs allege Defendants "received" a "thing (oil) that was not owed to [them]" and thus are bound to restore the minerals. ECF No. 50 at 9. Plaintiffs allege fault is immaterial under La. Civ. Code art. 2299, thus Defendants are obligated to return the value of the oil received from Plaintiffs regardless of whether Defendants acted in good faith. *Id.* Plaintiffs seek the full value of the minerals, along with the fruits and products without a reduction in expenses since the time that Defendants received actual or constructive notice that the leases with the State were invalid. *Id.* at 10.

This Court has recently acknowledged that "the law does not compel 'an election of remedies between a contractual theory and an unjust enrichment theory

prior to filing a complaint.'" *Shanghai Breeze Tech. Co., Ltd. v. Gravois Aluminum Boats, LLC*, 6:22-CV-02038, 2023 WL 1926609, at *5 (W.D. La. Jan. 25, 2023), *report and recommendation adopted*, CV 6:22-2038, 2023 WL 2950991 (W.D. La. Mar. 1, 2023) (citing *Schott, Trustee for Estate of InforMD, LLC v. Massengale*, 2019 WL 4738795 at *16 (M.D. La.)).[22]  Where there is a question of whether a contractual theory provides a remedy for the damages suffered by a plaintiff, a viable alternative unjust enrichment claim exists.  *Id.*; *see also Schott*, 2019 WL 4738795 at *17.  "The Revision Comments of Article 2299 clearly state that the remedy provided by the article is not subsidiary and is available even if other remedies are also available." *BP Am. Prod. Co. v. R.D. Briscoe, Inc.*, CIV A 08-1895, 2009 WL 2849528, at *4 (W.D. La. Sept. 2, 2009) (citing La. Civ. Code art. 2299, Comment (c)).[23]

---

[22] This Court holds that:

> Rule 8(d) permits a plaintiff to assert alternative and inconsistent causes of action. While Shanghai did not use the phrase "in the alternative" in pleading the unjust enrichment claim, it could assert such an equitable claim even if it is inconsistent with any action at law. "[T]he law does not compel 'an election of remedies between a contractual theory and an unjust enrichment theory prior to filing a complaint.' " *Schott, Trustee for Estate of InforMD, LLC v. Massengale*, 2019 WL 4738795 at *16 (M.D. La.) (quoting *Prop. One, Inc. v. USAgencies, LLC*, 830 F. Supp. 2d 170, 181 (M.D. La. 2011)).

*Shanghai Breeze Tech. Co., Ltd. v. Gravois Aluminum Boats, LLC*, 6:22-CV-02038, 2023 WL 1926609, at *5 (W.D. La. Jan. 25, 2023), *report and recommendation adopted*, CV 6:22-2038, 2023 WL 2950991 (W.D. La. Mar. 1, 2023).  Louisiana's federal district courts are divided on whether Rule 8 permits a plaintiff to plead unjust enrichment in the alternative. *See Bureau Veritas Commodities & Trade, Inc. v. Nanoo*, CV 20-3374, 2021 WL 2142466, at *7–8 (E.D. La. May 26, 2021) (discussing cases).

[23] The comments to Article 2299 provides:  "[T]his remedy is available even if other remedies are also available but there can be no double recovery . . . Thus, a plaintiff may choose to bring an action in revendication, an action in tort, an action grounded on enrichment without cause, or an action grounded on Article 2299 for the return of a thing not owed."  La. Civ. Code art. 2299, Comment (c).

The factual allegations in the Amended Complaint (ECF No. 50) easily raise a right to relief above the speculative level for recovery of a thing not owed.

F.   **Plaintiffs' Amended Complaint (ECF No. 50) meets the pleading standard of Rule 8.**

Federal Rule of Civil Procedure 12(e) provides that a motion for more definite statement may be filed when ". . . a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading . . . ." Fed. R. Civ. P. 12(e). The standard for evaluating a motion for more definite statement is whether the complaint is so "excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*, 235 F.R.D. 632, 633 (E.D. La. 2006), *citing Advanced Communications Technologies, Inc. v. Li*, No. 05 Civ. 4628, 2005 WL 3215222, at *3 (S.D.N.Y. Nov. 30, 2005) (citing *Bower v. Weisman*, 639 F.Supp. 532, 538 (S.D.N.Y. 1986)).

When evaluating a motion for more definite statement, a Court must assess a complaint in light of the minimal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, which provides, in relevant part, only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Babcock*, 235 F.R.D. at 633; *see also* Fed. R. Civ. P. 8(a)(2). Additionally, due to the availability of extensive discovery on a plaintiff's claim, Rule 12(e) motions are disfavored. *City of DeQuincy v. Emps. Mut. Cas. Co.*, 2023 WL 2604022, at *1 (W.D. La. Mar. 22, 2023). Accordingly, such motions are inappropriate when the pleading meets the standards

of Rule 8, the information is already known to the defendant, or the information sought can otherwise be obtained by discovery. *Id.*

Here, Plaintiffs have complied with the requirements of Rule 8, as the Plaintiffs' Amended Complaint (ECF No. 50) contains a short and plain statement of the claims asserted. The Amended Complaint (ECF No. 50) and included attachments provide fair notice to Defendants of the claims alleged.

Thus, to the extent White River and Day Town seek a more definite statement (ECF Nos. 35, 56, 80), it should be denied.

## III. <u>Conclusion</u>

Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 35, 36, 53, 56, 80, 82) should be DENIED IN PART and GRANTED IN PART, as follows:

Because Plaintiffs fail to state a claim for revendicatory relief, Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 35, 36, 53, 56, 80, 82) should be GRANTED IN PART to the extent they seek dismissal of Plaintiffs' revendicatory claim. Plaintiffs' claims for revendicatory relief against Defendants should be DISMISSED WITH PREJUDICE.

Because Plaintiffs' claims under La. Civ. Code arts. 2305 and 2299 are not prescribed, SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 36, 53, 82) should be DENIED IN PART to the extent they seek dismissal of those claims as prescribed.

Because Plaintiffs state sufficient claims for relief under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed, SOG's Rule 12(b)(6) Motions to

Dismiss (ECF Nos. 36, 53, 82) should be DENIED IN PART to the extent they seek dismissal of those claims.

Because Plaintiffs' Amended Complaint (ECF No. 50) complies with the requirements of Rule 8, White River's and Day Town's Rule 12(e) Motions for More Definite Statement (ECF Nos. 35, 56, 80) should be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this __6th__ day of September 2023.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE